| UNITED STATES DISTRICT COURT | FOR ONLINE PUBLICATION ONLY |
|---|---|
| EASTERN DISTRICT OF NEW YORK | |

-----------------------------------------------------------x

EVELYN PIERRE,

               *Plaintiff*,               MEMORANDUM
                                                           AND ORDER
      -against-                               09-CV-1864 (JG)

MICHAEL J. ASTRUE, Commissioner of
Social Security,

               *Defendant*.

-----------------------------------------------------------x

A P P E A R A N C E S:

    BINDER & BINDER, P.C.
        215 Park Avenue South, 6th Floor
        New York, New York 10003
    By:    Jeannine LaPlace
        *Attorney for Plaintiff*

    BENTON J. CAMPBELL
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, NY 11201
    By:    John M. Kelly
        *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        Evelyn Pierre has brought this action against Commissioner of Social Security Michael Astrue under 42 U.S.C. § 405(g), seeking review of Astrue's decision that she is not entitled to a period of Social Security Disability Insurance ("DDI") and Supplemental Security Insurance ("SSI") benefits under Titles II and XVI of the Social Security Act ("the Act"). The parties have cross-moved for judgment on the pleadings, the Commissioner seeking affirmation of his final decision that Pierre is not disabled, and therefore not eligible for DDI and SSI benefits, and Pierre seeking a reversal and remand for the sole purpose of awarding benefits.

Oral argument on the cross-motions was held on December 11, 2009. For the reasons that follow, Pierre's motion is granted, but only to the extent that the case is remanded for further proceedings, and the Commissioner's motion is denied.

BACKGROUND

A.  *Pierre's Claim of Disability*

Pierre was born in Trinidad on May 23, 1948 and is now 61 years old. She attended school until she was 16 years of age, completing the equivalent of a seventh grade education. After living in the United States for 17 years, Pierre became a citizen in 1997. Pierre has six children who are all over the age of 18. For seven years, Pierre worked as a housekeeper at a large law firm. In 1996, Pierre worked for one year at an airport cleaning the waiting room and bathroom.

In June 1993, Pierre injured her back and neck in a slip and fall accident at work. She collected worker's compensation and returned to work in 1995. By February 1997, her spinal impairments no longer permitted her to work. She alleges that she was disabled beginning on March 3, 1997 and has not worked since that date. Since March 2005, Pierre has been treated by a psychiatrist at least once a month, and at times she has been treated twice a week. The psychiatrist has prescribed Zoloft. Pierre testified that she has anxiety and panic attacks twice a month that last for approximately 20 minutes.

Since the time of her 1993 injury, Pierre has taken a cab or a bus to her doctor's appointments. In order for her to board the bus, the bus must kneel. Since her injury, Pierre cooks once a week and requires assistance with the laundry. She is able to walk four to five blocks and stand for a half-hour to three-quarters of an hour. She can move from side to side but

cannot bend or kneel. She can sit for only one-half to three-quarters of an hour before her back hurts.

B.   *Procedural History*

Pierre's application for DDI and SSI benefits has an unnecessarily long procedural history. She filed it on March 30, 1997, alleging disability due to spinal impairments. The application was denied initially and again upon reconsideration. On September 15, 1999, after a hearing, ALJ Manuel Cofresi found that Pierre was not disabled and was therefore ineligible for SSI or DDI benefits. Twenty-eight months later, on January 18, 2002, the Appeals Council vacated ALJ Cofresi's decision and remanded the case for further proceedings. On December 14, 2002, Cofresi found again that Pierre was not entitled to benefits. Fifteen months later, on March 26, 2004, the Appeals Council vacated ALJ Cofresi's decision and remanded the case for further proceedings before a different ALJ. On November 10, 2005, ALJ Marilyn Hoppenfeld issued a decision denying benefits yet again. Nineteen months later, on June 7, 2007, the Appeals Council vacated ALJ Hoppenfeld's decision and remanded the case for further proceedings. On April 10, 2008, ALJ Hoppenfeld held another hearing regarding Pierre's claims. On July 24, 2008, ALJ Hoppenfeld found that Pierre was disabled as of May 23, 2003, but not prior to that date. Accordingly, Pierre was eligible for benefits as of May 23, 2003, but ALJ Hoppenfeld found that Pierre was not disabled on or before December 31, 2002, the date she was last insured. On March 17, 2009, 12 years after Pierre filed her application for benefits, the Appeals Council denied Pierre's request for review of the ALJ's partially favorable decision.

Pierre filed the complaint in this case on September 11, 2009, alleging that the Commissioner's decision is not supported by substantial evidence and that she is disabled.

C.  *The Medical Evidence*

   1.  *Dr. Susan Jensen -- Treating Physician*

Pierre first saw Dr. Susan Jensen (also known as Zahalsky), a physician in the rehabilitation section of EAP Medical Services, on January 22, 1997. R. 424. At that time, Pierre was having difficulty standing, lifting and bending for more than 30 minutes. *Id.* Jensen saw Pierre again in February 1997. R. 351. Jensen noted again Pierre's tenderness in the back and her continued left antalgic gait.[1] *Id.* At that time, Jensen stated that Pierre was temporarily partially disabled. R. 352.

In February 1997, an MRI was taken of Pierre's spine. R. 430. The impression was that there was mild degenerative lumbosacral spondylosis at L5-S1.[2] *Id.*

After her examination in February 1997, Jensen treated Pierre almost continuously from August 1997 through October 1998. From August 14, 1997 through December 11, 1997, Jensen saw Pierre every month, except November. R. 331-32, 336, 341-42, 346-47. In each examination, Jensen noted that Pierre walked with an antalgic gait and that she continued to experience tenderness in the back. *Id.* In contrast to prior diagnoses, Jensen noted as early as August 1997 that Pierre was permanently partially disabled. *Id.*

Jensen saw Pierre again on January 15, 1998. R. 253. In her evaluation, she indicated that Pierre received therapy three times a week and was still having difficulty cooking,

---

[1]  An antalgic gait is a "limp in which a phase of the gait is shortened on the injured side to alleviate pain experienced when bearing weight on that side." *American Heritage Medical Dictionary,* http://medical-dictionary.thefreedictionary.com/antalgic+gait.

[2]  Spondylosis is a "degenerative disease of the spinal column, especially one leading to fusion and immobilization of the vertebral bones." *American Heritage Medical Dictionary,* http://medical-dictionary.thefreedictionary.com/spondylosis. Lumbosacral refers to the lumbar vertebrae and the sacrum. *Id.,* http://medical-dictionary.thefreedictionary.com/lumbosacral.

4

standing, sitting, bending and lifting. Jensen also noted that Pierre had not worked since March 1997. *Id.* Pierre had a "wide based gait that is bilaterally antalgic." R. 254. She had difficulty doing heel and toe walking and can squat and rise 50 percent of the way down whereas previously she could go ten percent of the way down. *Id.* There was less tenderness in the left lumbosacral paraspinal muscles than previously, but still severe tenderness in the left sacroiliac joint.[3] *Id.* There was still tenderness in the deep hip abductor muscles, and a stretch test revealed pain running down the right thigh in a radicular fashion. *Id.* Jensen stated that Pierre was permanently partially disabled and that she would never be able to return to the work she had done before. R. 255. Jensen recommended physical therapy. *Id.*

Jensen saw Pierre again on March 4 and April 3, 1998. R. 316, 321. Pierre was feeling worse in the one month interval between the visits. *Id.* Jensen's observations remained substantially the same; she noted there was tenderness in Pierre's back and that she was permanently partially disabled. R. 317.

On May 7, 1998, Jensen saw Pierre again. R. 262. Pierre had "terrible difficulty getting from sit to stand and holds onto her left sacroiliac joint as she arise[s] from a chair." R. 263. She was walking with a gait due to severe pain, and noted continued tenderness in various areas of her neck and back. R. 263-64. Pierre's physical exam was "highly abnormal in the neck area." R. 265. Jensen stated again that Pierre was permanently partially disabled. R. 264.

Jensen saw Pierre on June 10, 1998 and indicated that Pierre's symptoms had worsened since May 1998. R. 304. Although Jensen noted several improvements, she also noted that Pierre continued to experience tenderness in her back and neck. R. 305-06. Jensen

---

[3] The left sacroiliac joint connects the spine to the pelvis and is formed by the connection of the sacrum and the left iliac bone. MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=85228.

saw Pierre on July 21, 1998 and again August 26, 1998 and her diagnosis remained substantially the same. R. 294-301. In her evaluations for June, July and August, Jensen stated that Pierre was permanently partially disabled. R. 294, 301, 307. In one instance, she noted that she could not imagine any work that Pierre would be capable of performing. R. 294.

On July 28, 1998, Jensen completed a Questionnaire for the Division of Disability Determination of the New York State Office of Temporary and Disability Assistance. R. 268. In the questionnaire, Jensen noted again that there was inflammation and derangement in Pierre's left sacroiliac joint. *Id.* Jensen also noted that Pierre had chronic post-traumatic lumbosacral radiculopathy.[4] *Id.*

On August 26, 1998, Jensen completed a Lumbar Spine Residual Functional Capacity Questionnaire. Jensen noted that she saw Pierre on a monthly basis and that she likely had a herniated lumbar disc, cervical facet syndrome with bilateral radiculitis and severe carpal tunnel syndrome.[5] R. 273. Jensen indicated that Pierre suffered from severe neck, back and hand pain. *Id.* Her prognosis was poor. R. 274. She could sit continuously for only fifteen minutes and could stand for only ten. *Id.* Jensen stated that Pierre was "absolutely not" a malingerer and that she experienced constant pain. R. 275. Jensen indicated that Pierre could not work. R. 277.

---

[4] Radiculopathy describes a problem when one or more nerves are affected and do not function properly. This condition "can result in pain, weakness, numbness or difficulty controlling specific muscles." http://encyclopedia.thefreedictionary.com/radiculopathy.

[5] Cervical facet syndrome "implies axial pain presumably secondary to involvement of the posterior elements of the cervical spine." Associated with cervical facet syndrome are tenderness and pain. Emedicine, http://emedicine.medscape.com/article/93924-overview. Radiculitis is pain which radiates along the sensory distribution of a nerve due to inflammation or other irritation of the nerve root. http://encyclopedia.thefreedictionary.com/radiculitis+.

On October 19, 1998, Jensen saw Pierre again. Jensen noted that Pierre's prognosis was fair, but that she suffered from a life-long chronic condition. R. 279. Her observations about Jensen's daily activities remained substantially the same. *Id.* There was tenderness in Pierre's neck and back. R. 280-81. Though Pierre walked more normally than she had six months prior, she still experienced pain with heel and toe walking. R. 281. Again, Jensen noted that Pierre was partially and permanently disabled. R. 282.

In June 1999, Jensen saw Pierre again. R. 363. Jensen noted that Pierre "clearly has a permanent disability for which physical therapy ameliorates symptoms but cannot effect a permanent cure." *Id.* Jensen indicated that Pierre's care had been discontinued in December 1998. *Id.*

On June 1, 2000, Jensen completed a Lumbar Spine Impairment Questionnaire. She diagnosed Pierre with left sacroiliac inflammation and derangement and cervical facet syndrome with displacement of upper rib heads. R. 368. Pierre's prognosis was fair. *Id.* Jensen stated that in an eight-hour day, Pierre could sit for a total three hours, though not continuously, and she could stand or walk for one hour. R. 370. Jensen stated that it was medically recommended that Pierre not sit, stand or walk continuously in a work setting. R. 371. Jensen stated that Pierre could occasionally carry and lift up to five pounds, but could never lift or carry anything heavier. *Id.* Jensen noted on the questionnaire that Pierre experienced frequent pain severe enough to interfere with her attention and concentration. R. 372.

2. *Dr. Patricia Martindale -- Treating Physician*

Dr. Patricia Martindale treated Pierre beginning in July 1998 and treated her at

7

least every six weeks until July 24, 2001.[6]  R. 375, 378.  On June 22, 2001, Pierre had an x-ray taken at Martindale's request, which revealed mild lumbar spondylosis.  R. 387.

On August 9, 2001, Martindale completed a Multiple Impairments Questionnaire regarding Pierre.  R. 378.  She indicated that Pierre had chronic low back pain but that her prognosis was fair.  *Id.*  Pierre's pain was moderate to severe.  R. 379.  She could sit for two hours and stand or walk for less than one hour a day.  R. 380.  Pierre had no limitations in the use of her hands or fingers for fine manipulations, but she had moderate difficulties grasping, turning and twisting objects as well as reaching her arms overhead.  *Id.*  Pierre could not push, pull, bend or stoop.  R. 383.

    3.    *Dr. Apostolos P. Tambakis -- Examining Orthopedic Surgeon*

On August 15, 1999, Dr. Apostolos P. Tambakis examined Pierre.  R. 147.  Pierre complained of persistent pain in the lower back.  *Id.*  She had difficulty putting her shoulders in an overhead position, behind the neck and behind the back, but they could rotate normally.  *Id.*  Pierre's grip was weak on both upper extremities, but she walked without a limp.  *Id.*  She had difficulty rolling from a supine-prone position and had tenderness and muscle spasm in the lower back and the neck.  *Id.*  Tambakis diagnosed Pierre with chronic low back derangement with signs of sciatic radiculitis on the left side.  R. 148.  He stated that Pierre had a "moderate-marked disability" and that she had difficulty standing, walking, climbing stairs and sitting for too long.  *Id.*  He further noted that she was unable to continuously bend, lift or carry objects heavier than ten pounds.  *Id.*

---

    [6]    The length of Martindale's treatment of Pierre is based entirely on Martindale's statement in the Multiple Impairments Questionnaire.  Medical records documenting Pierre's visits to Martindale are not part of the record before me.

On May 14, 2002, Tambakis examined Pierre a second time. R. 401. Pierre again had difficulty bringing both shoulders into an overhead position, and she had difficulty getting up from a sitting position. *Id.* She had tremendous difficulty rolling from a supine-prone position, and tenderness and muscle spasm were present in the lumbar spine. *Id.* His diagnosis remained the same as when he examined Pierre three years earlier. R. 402. He further stated that she could not lift or carry objects heavier than five to seven pounds. *Id.*

On May 8, 2002, Tambakis completed a Spinal Impairment Questionnaire. R. 403. He diagnosed Pierre with derangement of the lumbar spine and sciatic radiculitis. *Id.* His prognosis was guarded. *Id.* Tambakis stated that Pierre could sit for four hours a day and stand or walk for less than one hour. R. 406. He noted that it was necessary that Pierre not sit, stand or walk continuously in a work setting. *Id.* He indicated that she could frequently lift and carry up to five pounds, occasionally lift and carry up to ten and never lift or carry anything heavier. R. 406-07. Tambakis stated that Pierre's impairments were ongoing and would last at least 12 months. *Id.*

    4.  *MRI Taken on November 30, 2004*

On November 30, 2004, a MRI of Pierre's cervical spine was taken. The MRI revealed that discs from C4-C5 through C6-C7 were narrowed and degenerated and demonstrated diffuse annular bulging anteriorly and posteriorly. R. 476. Further, the C6-C7 disc showed prominent left posterolateral disc herniation deforming the thecal sac and impinging upon the lateral recess and proximal neural foramen. *Id.* The MRI test results reveal the possibility of impingement on the nerve root. *Id.* The impression was that there were spondylotic changes most notably in the C6-C7 disc. R. 477.

9

5. *Dr. Donald I. Goldman -- Examining Orthopedic Surgeon*

Dr. Donald Goldman examined Pierre on April 8, 2008. R. 563. Pierre's range of motion in her lumbar spine was limited. R. 564. Goldman stated that his final impression was that Pierre suffered from a cervical herniated disc with cord pressure, multiple bulging discs, lateral recess stenosis of the cervical spine, lumbar derangement and radiculopathy and lumbar discogenic spondylosis.[7] R. 566. Goldman noted that Pierre's prognosis was guarded and that she suffered from a permanent disability. *Id.* Goldman stated that Pierre could not sit for more than 20-25 minutes, walk more than one to two blocks, carry more than five to ten pounds and had limited ability to kneel, squat, bend, push, pull and climb. R. 567.

6. *Andrew Pasternak -- Vocational Expert*

Andrew Pasternak testified at the April 10, 2008 hearing as a vocational expert. Pasternak testified that an individual aged 50, with Pierre's education and past work and with a residual functional capacity for light work could continue with her past work at the law office. R. 623. Further, Pasternak testified that an individual of Pierre's age who could perform light work consisting of simple, repetitive and non-decision making responsibilities would be able to perform the job of a housekeeper at a law firm. R. 625. Pasternak also testified that there were jobs that required light work and were also low stress at which Pierre could work. Pasternak testified that if an individual between the age of 49 and 56 with a limited education and Pierre's work history was able to perform only sedentary work, then a finding that she was disabled was appropriate because she had no transferable skills. R. 624.

---

[7] Stenosis is the constriction or narrowing of a duct or passage. http://www.thefreedictionary.com/stenosis+.

7.  *Dr. Justin Willer -- Non-Examining Medical Expert*

At the November 19, 2002 administrative hearing regarding Pierre's claim for SSI and DDI benefits, Dr. Justin Willer testified. Willer did not examine Pierre. He reviewed the medical evidence and stated that Pierre's back pains kept "switching sides," and although that is possible, it should not do so with such frequency. R. 746-47. Willer testified that the diagnosis of sacroilitis was inconsistent with the findings of negative straight leg raising. R. 747-48. Willer further stated that sacroilitis does not cause pain radiation. R. 748. In sum, Willer testified that none of the findings explained Pierre's complaints of severe pain and inability to function. R. 749.

8.  *Dr. S. Gowd -- Non-Examining State Medical Consultant*

On April 17, 1988, Dr. S. Gowd provided a residual functional capacity assessment regarding Pierre. Gowd did not examine Pierre. Gowd found that Pierre could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds. R. 192. He also found that she could stand, walk or sit for six hours of an eight-hour workday. *Id.* He found that she had no limitations in her ability to push and pull. *Id.*

9.  *Dr. Anthony Buonocore -- Non-Examining State Medical Consultant*

On August 6, 1998, Dr. Anthony Buonocore completed a residual functional capacity assessment based solely on his review of Pierre's medical records; like Gowd, Buonocore did not examine Pierre. Buonocore found that Pierre could occasionally lift and carry ten pounds and could frequently lift and carry less than ten pounds. R. 200. Buonocore found that Pierre could sit, stand or walk for about six hours of the eight-hour workday. *Id.* Buonocore found that Pierre had limited ability to push or pull in her lower extremities. *Id.*

11

DISCUSSION

A. *The Legal Standard*

Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine whether it is "'supported by substantial evidence in the record as a whole or [was] based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)). In deciding whether the Commissioner's conclusions are supported by substantial evidence, a reviewing court must "first satisfy [itself] that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purpose of the Act.'" *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)).

Under the Social Security Act, Pierre is entitled to SSI benefits if "by reason of [a] medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than twelve months," 42 U.S.C. § 1382c(a)(3)(A), she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id.* at § 1382c(a)(3)(B). The Commissioner decides whether the claimant is disabled within the meaning of the Act. 20 C.F.R. § 416.927(e)(1).

The Social Security Administration's regulations break down the inquiry into a five-step process:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits [her] physical or mental

12

> ability to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations. If the claimant has such an
> impairment, the Commissioner will consider him disabled without
> considering vocational factors such as age, education, and work
> experience; the Commissioner presumes that a claimant who is
> afflicted with a listed impairment is unable to perform substantial
> gainful activity. Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, [she] has the residual functional capacity to
> perform [her] past work. Finally, if the claimant is unable to
> perform [her] past work, the Commissioner then determines
> whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation marks, brackets and ellipsis omitted); *see also* 20 C.F.R. § 416.920(a)(4) (setting forth this process).

In making the required determinations, the Commissioner must consider (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, her family and others; and (4) the claimant's educational background, age and work experience. *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). Further, the ALJ conducting the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits. *See* 20 C.F.R. § 416.1400(b) (expressly providing that the Social Security Administration "conduct the administrative review process in an informal, nonadversary manner"); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. . . ."); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). If "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no

13

purpose," it is appropriate for a court to reverse an ALJ's decision and order the payment of benefits. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).

B.      *The ALJ's Decision*

Applying the five-step sequential evaluation prescribed by 20 C.F.R. § 416.920(a)(4), the ALJ found at step one that Pierre had not engaged in substantial gainful activity since March 30, 1997. R. 20. At step two, she found that Pierre's "severe" impairments for the purposes of § 416.920(c) were: left sacroiliac joint inflammation/derangement; cervical facet syndrome with displacement of upper rib heads; derangement lumbar spine; and sciatic radiculitis on the right. *Id*. She further found that from 2005 on, Pierre alleged generalized anxiety disorder and major depressive disorder in remission. *Id.* The ALJ found at step three that Pierre's impairment or combination of impairments did not equal the severity of any conditions in the Listings of Impairments contained in Appendix 1 to Subpart P of Part 404 of the Social Security Administration's regulations. *Id.* At step four, the ALJ found that Pierre was disabled, but not until May 23, 2003, which was approximately five months after her date last insured of December 31, 2002. *Id.* The ALJ found that prior to May 23, 2003, Pierre retained the residual functional capacity ("RFC") to perform the full range of light work, which rendered her able to perform her past relevant work as a law firm housekeeper. R. 21.

C.      *The ALJ's Duty to Develop the Record*

In deciding whether the Commissioner's conclusions on the issue of disability are supported by substantial evidence, the reviewing court

> must first satisfy [itself] that the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act. The need for this inquiry arises from the essentially non-adversarial

nature of a benefits proceeding: the [Commissioner] is not represented, and the ALJ, unlike a judge in a trial, must himself affirmatively develop the record.

*Echevarria*, 685 F.2d at 755. At the outset it must be noted that, as confirmed by counsel at oral argument, the treatment records of one of the physicians, Dr. Martindale, are entirely absent from the record. The only document in the record from Martindale is a Multiple Impairments Questionnaire completed on August 9, 2001. Martindale treated Pierre for a period of three years. In order for the ALJ to adequately review Pierre's claim upon remand, the record must be supplemented to include, if available, Martindale's records.

D. *The ALJ's Evaluation of the Medical Evidence*

    1. *The ALJ's Decision to Discredit the Findings of Dr. Jensen and Dr. Martindale*

Pierre argues that the ALJ erroneously failed to accord controlling weight to the findings of Drs. Jensen and Martindale, her treating physicians. The Commissioner argues that the ALJ properly declined to accord Jensen's and Martindale's assessments controlling weight because they were not well-supported by objective medical evidence and were inconsistent with the other evidence in the record. While the final determination as to disability rests with the Commissioner, 20 C.F.R. § 416.927(e)(1), a treating physician's opinion about a claimant's impairments is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations).

When the Commissioner does not give a treating physician's opinion controlling weight, the weight given to that opinion must be determined by reference to: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence

15

in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal*, 134 F.3d at 503 (citing 20 C.F.R. § 416.927(d)(2)). The Commissioner must set forth "good reasons" for failing to accord the opinions of a treating physician controlling weight. *See, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians [sic] opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). The ALJ is required to explain the weight given to treating source opinions when they are found not to be controlling, and to provide some explanation for rejecting them. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see also Heath v. Astrue*, No 07-CV-1238, 2008 WL 1850649, at *2 (E.D.N.Y. Apr. 24, 2008) ("Where there is conflicting evidence on the issue of disability, 'it is for the [Social Security Administration], and not this court, to weigh the conflicting evidence in the record,' particularly when the court 'cannot say with certainty what weight should be assigned ... to the opinion of plaintiff's treating physician.'") (*quoting Schaal*, 134 F.3d at 504 (alterations in original)).

The parties agree that, for the purposes of Pierre's claim, Jensen and Martindale both were Pierre's treating physicians during the period of her claimed disability. Although Jensen treated Pierre for over a year from 1997 to 1998 and Martindale treated her for three years, the ALJ decided not to give their opinions controlling weight. The ALJ found that neither doctor's residual functional capacity assessments would be controlling and were not entitled to "great weight" because (1) they were contradicted by medical findings, including MRI findings

16

and (2) were not consistent with Pierre's activities, which included caring for her personal needs, using public transportation, shopping and functioning on a daily basis. I conclude that the ALJ did not provide good reasons for not giving Jensen or Martindale's opinions controlling weight. Moreover, she failed even to mention the weight these opinions were given (except to say it was not "great"), let alone apply the factors set forth in the regulations that are intended to inform such determinations.

The first reason offered by the ALJ is that medical evidence, including MRI findings, contradicts the medical findings of the two treating physicians. This rationale might be a "good reason" but for the conflicting evidence in the record on this score. Evidence in support of medical opinions is of course generally one of the factors that an ALJ may consider when determining the proper weight to give the opinion. *See* 20 C.F.R. § 416.927(d)(3).

The evidence the ALJ relied on to contradict the opinions of the two treating sources consisted of two MRIs taken seven years apart. Both MRIs revealed spondylosis and both revealed abnormalities in the spine -- objective findings that were consistent with the medical findings of both Jensen and Martindale. That the MRIs did not reveal additional spinal injuries is insufficient to displace the treating physician rule. Moreover, two additional medical opinions -- the opinions of Dr. Tambakis and Dr. Goldman -- further support the opinions of Jensen and Martindale. All four of these physicians found Pierre was disabled from 1997. From 1997 through at least 2001, several physicians, as supported by medical findings, consistently found Pierre had (1) chronic back pain; (2) tenderness in the neck and back; (3) sacroiliac inflammation and derangement; (4) lumbosacral radiculopathy; and (5) lumbar spondylosis.

17

Even if the ALJ thought otherwise based on the reports of two state agency consultants, neither of whom examined Pierre, she should have inquired further.  Under the regulations, when the evidence received from a treating physician is inadequate to determine whether a claimant is disabled, the ALJ "will need additional information to reach a determination or a decision."  20 C.F.R. § 416.912(e).  Additional clarifying information is sought "when the report from [a] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  *Id*.  If the ALJ saw a conflict between the other evidence in the record and Jensen's and Martindale's opinion that Pierre was disabled, she should have sought clarification from the treating physicians.

The ALJ's second reason for failing to give the opinions of Jensen and Martindale controlling (or "great") weight was that they were not consistent with the claimant's daily activities.  Pierre testified that she cooks once a week, but requires assistance with the laundry.  She testified that she takes the bus to her doctor's appointments, but the bus must kneel before she is able to board.  She testified that she could walk four to five blocks, stand for a half-hour to three-quarters of an hour, and move from side to side, but could not bend or kneel and she could sit for only a half to three-quarters of an hour before her back hurts.  This testimony is consistent with the medical opinions of Jensen and Martindale.  Jensen and Martindale each independently found that Pierre could not walk for more than one hour a day continuously, which is consistent with her testimony that she could walk only four to five blocks.  That Pierre could cook once a week, or board a bus designed for an individual with disabilities, is hardly inconsistent with a finding that she cannot walk, stand or sit for extended lengths of time.

18

In addition to her failure to provide good reasons for not giving Jensen and Martindale's opinions *controlling* weight, the ALJ utterly failed to perform the required task of determining what weight it deserved. As discussed above, an ALJ is required by the regulations to explain the degree of weight a treating source's opinion deserves when it is found not to be controlling, and to consider specified factors in that determination. Here the ALJ failed, for example, to consider the frequency of the treating physicians' examinations of Pierre, and the length, nature and extent of Pierre's treatment relationship with them. This failure to determine the appropriate weight to accord Jensen and Martindale's opinions constitutes an independent legal error warranting remand. *See Snell*, 177 F.3d at 133 ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") (*quoting Schaal*, 134 F.3d at 505); *see also* 20 C.F.R. § 416.927(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

CONCLUSION

For the reasons discussed above, the Commissioner's motion for judgment on the pleadings is denied. I do not find that the only appropriate outcome is the award of benefits; accordingly, Pierre's motion for remand solely for the calculation of benefits is denied. Her motion is granted to the extent that the case is remanded for further proceedings consistent with this opinion. In light of how long this case has been pending, I direct the Commissioner to conduct the proceedings as quickly as possible.

So ordered.

John Gleeson, U.S.D.J.

Dated: January 6, 2010
Brooklyn, New York